**CHRISTOPHER A. CROFTS**
**United States Attorney**
**WSB# 5-1358**
**District of Wyoming**
**P.O. Box 661**
**Cheyenne, Wyoming 82001**

**JASON M. CONDER** WSB#6-3529
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**P.O. Box 449**
**Lander, Wyoming 82520**

**SAM HIRSCH**
**Acting Assistant Attorney General**
**Environment and Natural Resources Division**
**U.S. Department of Justice**
**950 Pennsylvania Avenue, N.W.**
**Washington, DC 20530-0001**

**ROBERT S. ANDERSON**
**Senior Counsel**
**Environmental Crimes Section**
**105 E. Pine Street, Missoula, MT 59803**

**FILED**
**U.S. DISTRICT COURT**
**DISTRICT OF WYOMING**

**DEC 19 2014**

**Stephan Harris, Clerk**
**Cheyenne**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CR 14- CR-301-R |
| **Plaintiff,** | |
| vs. | **NON-PUBLIC DOCUMENT** |
| **PACIFICORP ENERGY, a division of PACIFICORP** | |
| **Defendant.** | |

Plea Agreement

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States Department of Justice, by and through the United States Attorney for the District of Wyoming and the Environmental Crimes Section of the Environment and Natural Resources Division (hereinafter "the Department" or "the government"), and the Defendant PACIFICORP ENERGY, a division of PacifiCorp (hereinafter "the Defendant"), by and through its undersigned representatives, and pursuant to the authority of Defendant's Board of Directors, enter into this Stipulated Plea Agreement ("Agreement"). The terms of the Agreement are as follows:

1.      The Defendant is charged in the District of Wyoming by Information with two Class "B" Misdemeanor violations of the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703, 707(a).

2.      The Defendant's representative and counsel have read the charges against the Defendant and understand the nature and elements of the crimes with which the Defendant has been charged.

3.      The Defendant will enter voluntary pleas of guilty to the charges in the Information in this case.

4.      *Nature of the Agreement*: The parties agree that this Plea Agreement shall be filed and become a part of the record in this case, and will be governed by Federal Rule of Criminal Procedure 11(c)(1)(C). The Defendant understands that if the Agreement is accepted by the Court, it will not have an automatic right to withdraw its plea. Fed. R. Crim. P. 11(d)(2)(A). This Plea Agreement binds the Department and the Defendant. During the term of probation, the Defendant shall provide the court with notice of any corporate name change or any other change in corporate structure or governance that would materially affect this Plea

Agreement and/or the Migratory Bird Compliance Plan ("MBCP"), discussed herein, within thirty days of such change. No change in name, business reorganization, merger, change of legal status, or similar action or event shall alter the Defendant's responsibilities under this Plea Agreement. The Defendant agrees that it shall not knowingly engage in any action to seek to avoid the obligations and conditions set forth in this Plea Agreement.

5. *Effect of Withdrawal from the Agreement:* The parties stipulate and agree that if the Defendant moves to withdraw its guilty plea, entered pursuant to and receiving the benefits of this Agreement, and if it successfully withdraws its plea either in the district court or on appeal, that this Agreement will become null and void. Moreover, if the Defendant at any time after judgment is entered obtains dismissal, reversal, or remand of the count(s) of conviction for any reason, the government will be permitted to restore all charges not filed pursuant to this Plea Agreement. The Defendant, in that circumstance, expressly waives any claim of double jeopardy or right to have this Agreement enforced. In such event, the Defendant waives any objections, motions, or defenses based upon the Statute of Limitations, the Speedy Trial Act, or any other potential restriction on the re-institution of counts dismissed, or institution of counts surrendered, as part of the consideration given by the government in this Agreement.

6. *Admission of Guilt:* The Defendant will plead guilty to the Information because it is in fact guilty of the charges contained in the Information. In pleading guilty, Defendant agrees and stipulates to the facts set forth in the Statement of Facts (Attachment A). Defendant agrees that, if this matter were to proceed to trial, the government would prove beyond a reasonable doubt, by admissible evidence, the facts set forth in Attachment A and as set forth in the criminal Information filed in this case.

7.    *Maximum Punishment Provided by Law:*  The Defendant has been advised of and understands the maximum potential punishment provided by law:

Counts One and Two each allege a Class "B" Misdemeanor, in violation of the MBTA, carrying a maximum penalty for an organizational defendant of a fine of not more than $15,000 (per 16 U.S.C. § 707(a)), or twice the gross gain or loss resulting from the unlawful conduct pursuant to 18 U.S.C. § 3571(d); five years of probation (per 18 U.S.C. § 3561(c)(2)); and a special assessment of $50 (per 18 U.S.C. § 3013(a)(1)(B)(ii)).

Additionally, the Court could impose additional conditions of probation to include the payment of community service or restitution pursuant to 18 U.S.C. § 3563(b), and a conviction could result in additional administrative sanctions such as suspension, debarment, and listing to restrict rights and opportunities of the defendant to contract with or receive benefits, loans, or assistance from agencies of the United States.

8.    *Elements of the Charges:*

The MBTA provides, in relevant part, that, unless and except as permitted by regulation, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, or attempt to take, capture, or kill any migratory bird. 16 U.S.C. § 703. Each bird listed in the Information is a "migratory bird" as that term is defined in the MBTA. See 50 C.F.R. § 10.13.

9.    The Defendant has been advised of the nature of the charges made against it and the elements of the crimes to which it is entering a guilty plea. The Defendant understands that if the case were to go to trial the government would be required to prove each and every element of the crime beyond a reasonable doubt. The Defendant further acknowledges that these are the elements of the crimes charged in the Information:

4

(a)     On or about the date(s) set forth in the Information, within the District of Wyoming, the Defendant, through a person or entity acting on its behalf, did take ("kill") approximately 336 "migratory birds," as that term is defined in 50 C.F.R. § 10.12, and as listed in 50 C.F.R. § 10.13, including at least 38 golden eagles, as well as other raptors, and passerine species such as larks, buntings and sparrows, at its Seven Mile Hill wind facility in Carbon County and its Glenrock/Rolling Hills wind facility in Converse County.

(b)     The taking was unlawful, in that neither the Defendant nor the person or entity acting on its behalf obtained a permit or other valid authorization to take the migratory birds listed in the charge.

10.     The Defendant understands that by entering the guilty pleas, the government will not be required to present proof of its guilt and the elements recited herein because there will be no trial if the Court accepts its pleas of guilty and the Plea Agreement of the parties.

11.     *Recitation of Rights:*

(a)     The government has the right in a prosecution for perjury or false statement to use any statement made under oath by any representative of the Defendant during the entry of pleas in this case.

(b)     If the Defendant persisted in a plea of not guilty to the charges against it, it would have the right to a public and speedy trial in the United States District Court.

(c)     The jury would find the facts and determine, after hearing all the evidence, whether or not it was persuaded of the Defendant's guilt beyond a reasonable doubt.

(d)     The Defendant has the right to be represented by counsel at trial and every other stage of these proceedings.

(e)     At a trial the government would be required to present its witnesses and other evidence against the Defendant.  The Defendant would be able to confront those government witnesses and its attorney would be able to cross-examine them.  In turn, the Defendant could present witnesses and other evidence in its own behalf.  If the witnesses for the Defendant would not appear voluntarily, it could require their attendance through the subpoena power of the court.

(f)     If convicted, and within ten days of the entry of the Judgment and Commitment, the Defendant would have the right to appeal its conviction to the Tenth Circuit Court of Appeals for review to determine if any errors were made which would entitle it to reversal of conviction.

12.     *Waiver of Rights by Plea:*  The Defendant understands that by pleading guilty pursuant to this Agreement it is waiving all the rights set forth in paragraph 11.  The Defendant's attorney and corporate representative understand those rights and the consequences of its waiver of those rights.

13.     *Corporate Authorization:*  Prior to entry of plea, the Defendant will provide to the Court and the Department a corporate resolution of the Defendant's Board of Directors authorizing the entry of plea and compliance with all provisions of this Plea Agreement, and that the Defendant's designated officer is authorized to appear on behalf of the Defendant to enter the guilty pleas in the District of Wyoming and appear for imposition of the sentence.

14.     The parties acknowledge that, inasmuch as the violations to which the Defendant will plead guilty are Class B misdemeanors, the advisory U.S. Sentencing Guidelines do not apply.  USSG §1B1.9.  The parties stipulate and agree to a sentence pursuant to Fed. R. Crim. P. 11(c)(1)(C) as follows:

15.     (a)   The parties stipulate and agree to a fine of $200,000 for each Count in this case—for a total fine amount of $400,000.  In order to resolve this matter expeditiously, the parties have not attempted to calculate the precise amount of gain accrued to the Defendant by the operation of the two wind facilities described in the Information or specific turbines that have unlawfully killed birds.  Instead, the parties stipulate that the proposed fine amount is less than twice the "gross gain" realized by the Defendant as the result of the criminal conduct in this case.  The parties agree that the $400,000 fine imposed is properly directed to the North American Wetlands Conservation Fund for wetlands conservation work in Wyoming, as specifically provided in the North American Wetlands Conservation Act.  16 U.S.C. § 4406(b).[1]

(b)   The parties stipulate and agree that the Defendant shall be sentenced to a term of sixty months' probation with the following specific conditions imposed.  Specifically, the parties stipulate and agree:

(i)   The Defendant will implement a Migratory Bird Compliance Plan ("MBCP" – Attachment B hereto), developed with the assistance of the United States Fish and Wildlife Service ("USFWS") and the Department.  The purpose of the MBCP is to (1) avoid and minimize golden eagle and other avian mortalities at the Defendant's four wholly-owned wind facilities in Wyoming— Seven Mile Hill, Glenrock/Rolling Hills, Dunlap, and High Plains/McFadden Ridge.  As noted therein, the parties agree that the Defendant shall not be required to spend more than $600,000 annually to implement the MBCP, recognizing that

---

[1] "The sums received under Section 707 of this title [MBTA] as penalties or fines, or from forfeitures of property are authorized to be appropriated to the Department of the Interior for purposes of allocation under section 4407 of this title [NAWCA Allocations Section]."

actual costs may vary from year to year based on advances in science and technology and the specific measures implemented during the term of the MBCP.

(ii).  The Defendant, USFWS, and the Department will meet at least once every six months during the first two years of the probationary period, and once every twelve months thereafter, during probation, to discuss the Defendant's progress in implementing the MBCP, and to address any issues or mutually agreed amendments necessary to ensure its effectiveness.  Every twelve months during the probationary period, the Defendant shall report in writing to the Court, the USFWS, and the Department concerning the progress it has made implementing the MBCP.

(iii).  The Defendant will make restitution to the state of Wyoming by depositing $200,000 within the first six months of probation,  in a fund or account as directed by the Wyoming Game & Fish Department, of which $100,000 will be used by the agency solely for responding to incidents involving federally protected wildlife or birds:

(iv).  The Defendant will perform community service by making a $ 1,900,000 payment within the first six months of probation to the National Fish and Wildlife Foundation, a private, non-profit, § 501(c)(3) tax-exempt organization, established by Congress in 1984 and dedicated to the conservation of fish, wildlife and plants and the habitat on which they depend.  The funds will be directed to the National Fish and Wildlife Foundation with the proviso that they be used in projects designed to conserve populations of golden eagles that utilize the areas in which the Defendant's Wyoming wind facilities are located, increase understanding of ways to minimize and monitor interactions between golden eagles and commercial wind power facilities, and rescue/rehabilitate golden eagles and other raptors found injured at or near wind facilities.  The Defendant will not claim this payment or any other

8

community service or restitution amount herein as a tax deduction or characterize it in any manner or forum as a donation or contribution.

16.   *Non-Prosecution:*  The purpose of the MBCP is to provide a collaborative framework for the Defendant's implementation of measures that will ensure compliance with the requirements of the Migratory Bird Treaty Act ("MBTA") and the Bald and Golden Eagle Act ("Eagle Act") during the term of the MBCP. Although the purpose of the MBCP is to minimize and mitigate future unpermitted bird mortalities at the Defendant's Wyoming wind facilities referenced in the MBCP, the parties acknowledge that some birds, including eagles, may be killed at the Defendant's wind facilities referenced in the MBCP despite conscientious implementation of the MBCP. As part of this Plea Agreement and in consideration of the Defendant's plea of guilty to Counts One and Two of the Information, the Defendant's promises and commitments in this Plea Agreement, and the Defendant's compliance with both this Agreement and the MBCP, the government agrees to forego additional criminal prosecution of the Defendant in the District of Wyoming for any other criminal offenses involving the unlawful taking of migratory birds, including eagles, at and by its currently operating Wyoming wind facilities which: (a) occurred before the date of this Plea Agreement; (b) are known to the government at the time of the signing of this Plea Agreement; and (c) are not presently the subject of negotiation or litigation between the Defendant or its subsidiaries, agents, or employees, and the government. The government further agrees not to prosecute the Defendant under the MBTA or the Eagle Act (16 U.S.C. §§ 668-668d) for unpermitted takings of migratory birds or other avian wildlife at and by its currently-operating Wyoming wind facilities that occur after the date of this Plea Agreement, provided the Defendant remains in compliance with the MBCP and other terms of this Agreement. This Plea Agreement applies

9

only to violations of the MBTA committed by the Defendant at its four Wyoming wind facilities described herein and has no effect on any proceedings against any entity or individual not expressly mentioned herein, including the actual or potential criminal liability of any individuals.  The government has informed the Defendant, however, that it does not intend to prosecute any individuals employed by it for any conduct described herein, or related hereto, unless it obtains new and material incriminating information not presently known to the government.  On a schedule to be determined by the parties within six months of sentencing, the Defendant will apply for, and diligently pursue, Programmatic Eagle Take Permit(s) ("ETPs") for the Wyoming wind facilities referenced in the MBCP.  Given the complex scientific and regulatory nature of this recently-established ETP program, the parties expect the application process will be lengthy.  Therefore, the government will extend its "non-prosecution" agreement under the Eagle Act and the MBTA beyond the probationary period, provided that Defendant continues to implement the MBCP and diligently pursue the ETPs in good faith, until the earlier of the following two events: 1) the Defendant has either obtained ETPs for the Wyoming wind facilities, referenced in the MBCP, that have taken eagles  and any appeals of such permits have been resolved, or 2) ten years from the date of sentencing by the Court.  The MBCP will terminate at each of Defendant's four Wyoming wind facilities referenced in the MBCP upon the issuance of a final ETP for that facility or upon termination of the non-prosecution period, whichever is earlier.  The Defendant understands and agrees that neither this paragraph nor this Plea Agreement limits the prosecuting authority of any federal, state or local regulatory or prosecuting entity, other than the United States Attorney's Office for the District of Wyoming and the Environmental Crimes Section or their successor agency or department.  Furthermore, this Plea Agreement does not provide or

promise any waiver of any civil or administrative actions, sanctions, or penalties that may apply, including but not limited to: fines, penalties, claims for damages to natural resources, suspension, debarment, listing to restrict rights and opportunities of Defendant to contract with or receive assistance, loans, and benefits from U.S. agencies, licensing, injunctive relief, or remedial action to comply with any applicable regulatory requirement.

17.     *Appeal Waiver:* The Defendant knowingly and voluntarily, after consultation with counsel, waives the right to appeal the conviction and sentence that is received as a result of this Plea Agreement.

18.     *Voluntary Plea:* The Defendant's attorney acknowledges that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement to induce the Defendant to plead guilty.

19.     *Special Assessment/Financial Obligations:* The Defendant recognizes that it will be responsible for a mandatory assessment of $50 on each count of the Information, pursuant to 18 U.S.C. § 3013 of the Comprehensive Crime Control Act. The Defendant understands and agrees that, pursuant to 18 U.S.C. § 3613, the monetary penalties in this Agreement imposed by the Court will be due and payable as stipulated in this Agreement and subject to immediate enforcement by the United States. If the Court imposes a schedule of payments, the Defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods available to the United States to enforce the judgment.

20.     *Entire Agreement:* Any statements or representations made by the United States, the Defendant, or its counsel prior to the full execution of this Plea Agreement are superseded by this Plea Agreement. No promises or representations have been made by the United States

or the Defendant except as set forth in writing in this Plea Agreement.  This Plea Agreement

constitutes the entire agreement between the parties.  Any term or condition which is not

expressly stated as part of this Plea Agreement is not to be considered part of the agreement.

CHRISTOPHER A. CROFTS
United States Attorney
Attorney for the Government

JASON M. CONDER
Assistant United States Attorney
Attorney for the Government

ROBERT S. ANDERSON
Senior Counsel
Environmental Crimes Section
Attorney for the Government

I am the authorized corporate representative of Defendant.  I have read this Plea
Agreement and every part of it has been carefully reviewed with responsible management and
officers of Defendant and its counsel, David Freudenthal.  I understand the terms of this Plea
Agreement and Defendant voluntarily agrees to those terms.  Defendant understands its rights,
possible defenses, and the consequences of entering into this Plea Agreement.  No promises or
inducements have been made to Defendant or to me other than those contained in this Plea
Agreement.  No one has threatened or forced Defendant in any way to enter into this Plea
Agreement.  Defendant is satisfied with its representation and counsel by David Freudenthal in
this matter.

Date: 12-19-14          BY:

Micheal G. Dunn
President and CEO
PacifiCorp Energy, a division of
PacifiCorp

I am Defendant's attorney.  I have carefully discussed this Plea Agreement with the
authorized representative(s) of Defendant.  I have fully advised Defendant of the corporation's
rights, possible defenses, and the consequences of entering into this Plea Agreement.  I believe
the decision of Defendant to enter into this Plea Agreement is informed and voluntary.

Date: 12/19/14     BY:

David Freudenthal,
Crowell and Moring, LLP

## ATTACHMENT A

## JOINT STATEMENT OF FACTS

This Joint Statement of Facts is incorporated by reference as part of the Plea Agreement between the Defendant PACIFICORP ENERGY, a division of PacifiCorp (hereinafter "the Defendant"), and the United States Attorney for the District of Wyoming and the Environment and Natural Resources Division, Environmental Crimes Section (together, the "Department" or the "government"). The parties stipulate that the following information is true and accurate to the best of their knowledge. Defendant admits, accepts, and acknowledges that it is responsible for the acts and omissions of its officers, directors, employees, and agents as set forth below. If this matter were to proceed to trial, the Department would prove beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information attached to this Agreement. This evidence would establish the following:

## I. Background

A. The Migratory Bird Treaty Act ("MBTA") provides for a Class B misdemeanor penalty for unpermitted takings of migratory birds. 16 U.S.C. §§ 703, 707. "Take" means "to pursue, hunt, shoot, wound, kill, trap, capture, or collect" or to attempt to do so. 50 C.F.R. § 10.12. "Kill" is not further defined. A list of bird species protected by the MBTA, including passerines, waterfowl, raptors (including golden eagles), and shorebirds, is found at 50 C.F.R. § 10.13. Criminal liability of corporations for violating the MBTA has been upheld in the Tenth Circuit. *See, e.g., United States v. Apollo Energies*, 611 F.3d 679, 683 (10th Cir. 2010); *United States v. Moon Lake Electric Ass'n, Inc.*, 45 F. Supp. 2d 1070 (D. Colo. 1999).

B. Golden eagles are not listed as threatened or endangered under U.S. law. However, they are one of many species protected by the MBTA, and are more specifically protected under the Bald and Golden Eagle Protection Act (hereinafter "the Eagle Act"), which provides a Class A misdemeanor penalty for the first offense of taking a bald or golden eagle knowingly, or with wanton disregard for the consequences of an act. Second and subsequent violations are Class E felonies.

C. The U.S. Fish and Wildlife Service ("USFWS") is the agency tasked with enforcing and implementing the MBTA and Eagle Act. There is currently no means or mechanism to acquire a programmatic permit to take a non-eagle migratory bird by operation of an industrial facility such as a wind project. However, as set forth in the USFWS's 2003 Interim Guidance on Avoiding and Minimizing Impacts from Wind Turbines, and its replacement, the 2012 Land-Based Wind Energy Guidelines, the USFWS Office of Law Enforcement focuses its resources on investigating and prosecuting those who take migratory birds without identifying and implementing reasonable and effective measures to avoid take, exercising enforcement and prosecutorial discretion regarding individuals and companies that make good-faith efforts to avoid the take of migratory birds. In 2009, following "delisting" of the bald eagle under the Endangered Species Act, the USFWS enacted the "Eagle Permit Rule" to allow issuance of programmatic (ongoing) and individual (one-time) permits for the non-purposeful take of bald and golden eagles. Between 2011 and 2013, the USFWS developed guidance on development of eagle conservation plans which are a precursor to applying for a programmatic take permit of eagles at commercial wind projects.

D. Counts One and Two of the Information each charge a violation of the MBTA's Class B misdemeanor "take" prohibition.  The government has exercised its discretion to charge this case under the MBTA, rather than the Eagle Act, for reasons stated below.

## II. Defendant's Development Of, and Avian Takings At, the Seven Mile Hill Wind Facility

A. Between 2007 and December 2008, Defendant developed a multi-project commercial facility in Carbon County, Wyoming, called the Seven Mile Hill wind powered energy facility (hereinafter "Seven Mile Hill").  The facility, sited primarily on private land used for cattle grazing, eventually comprised seventy-nine (79) 1.5 megawatt wind turbines. Development of Seven Mile Hill required no federal permitting by the USFWS, but was authorized by the Wyoming Industrial Siting Council and was issued a road-access "Right of Way" grant from the Bureau of Land Management. As is common during the development process for commercial wind projects, Defendant hired consultants to evaluate use of the site by wildlife, including birds, and determine the expected impact on such wildlife from the facility.  The consultants advised Defendant that, in addition to big game and other wildlife protected by state law, golden eagles and other species of raptors and migratory birds protected under federal law were observed in the project area and some were likely to be killed by collision with the wind turbines.

B. As part of its Wyoming Industrial Siting Council permit application, Defendant evaluated raptor usage in the project area, and the company developed raptor mortality estimates. The USFWS did not have the opportunity to review the avian use studies, mortality estimates, or turbine siting plan for Seven Mile Hill prior to the date when it became operational, and did not authorize any take of federally-protected avian species at the facility.  The government contends the Seven Mile Hill Project was constructed contrary

to relevant agency guidance regarding avoiding and minimizing avian take by wind facilities in effect during the period.

C. Consistent with the Wyoming state industrial siting permit, Defendant conducted three years of fatality monitoring at Seven Mile Hill after construction, which consisted of periodically searching for avian carcasses in the areas surrounding a portion of the turbines and meteorological towers. Defendant reported the findings to a technical advisory committee which consisted of representatives from the USFWS, Western EcoSystems Technology, Inc., Wyoming Game & Fish, and the Medicine Bow Conservation District. Between May 2009 and the date of these pleadings, the carcasses of 15 golden eagles, along with 56 additional non-eagle migratory birds (including raptors, larks, sparrows, and others, as described in the Information), were found at the facility. The eagle carcasses were sent to the USFWS National Forensics Laboratory in Ashland, Oregon, for forensic necropsy. Of those which were fresh enough and complete enough to analyze, several were determined to have been killed by blunt force-trauma consistent with turbine blade collision.

D. Defendant responded to the avian mortalities at Seven Mile Hill by developing a Bird and Bat Conservation Strategy ("BBCS") for the facility, as recommended in the 2012 Land-Based Wind Energy Guidelines, that includes additional eagle nesting/use studies, as well as a series of measures aimed at reducing the collision risk to eagles, including observer-based turbine curtailment (shut down), removal of carrion, and the testing of a system designed to detect and deter eagles and other large raptors from flying near turbines. Defendant will apply for a Programmatic Eagle Take Permit for Seven Mile Hill, pursuant to the Migratory Bird Compliance Plan that is Attachment B hereto.

4

### III. Defendant's Development Of, and Avian Takings At, the Glenrock/Rolling Hills Wind Facility

A. Between 2006 and December 2008, Defendant developed a multi-project commercial facility called the Glenrock/Rolling Hills wind powered energy facility (hereinafter "GRH") on lands that included the former Dave Johnston Coal Mine owned by the Defendant in Converse County, Wyoming.  The mine ceased commercial operation in the early 1980s.  As part of mine reclamation efforts, the USFWS required Defendant to construct two artificial eagle nest platforms at the site.  Defendant voluntarily erected seven platforms, and other perching structures.  Reclamation succeeded: by 2006 the site had nests being used by raptors, including golden eagles.

B. As it did for Seven Mile Hill, Defendant hired consultants to evaluate use of GRH by wildlife, including birds, and determine the expected impact on such wildlife from the project.  Similar to Seven Mile Hill, the consultants advised Defendant that, in addition to big game and other wildlife protected by state law, golden eagles and other species of raptors and migratory birds protected under federal law were observed in the project area and some were likely to be killed by collision with wind turbines.   As part of its Wyoming Industrial Siting Council permit application, Defendant evaluated raptor usage in the project area, and the Defendant developed raptor mortality estimates.

C. Defendant sought and obtained from the USFWS a permit to relocate three artificial golden eagle nest platforms within the GRH footprint that the company had constructed during mine reclamation.  However, the USFWS did not have the opportunity to review the avian use studies, mortality estimates, or turbine siting plan for GRH prior to the date when it became operational, and did not authorize any take of federally-protected avian

species at the facility.  The government contends the GRH Project was constructed contrary to relevant agency guidance regarding avoiding and minimizing avian take by wind facilities in effect during the period.

D.  GRH became operational in late 2008 and early 2009, and consisted of one hundred fifty-eight (158) 1.5 megawatt turbines with a total capacity of 237 megawatts.  Consistent with the Wyoming state industrial siting permit, Defendant conducted three years of fatality monitoring at the GRH project after construction, which consisted of periodically searching for avian carcasses in the areas surrounding a portion of the turbines and meteorological towers.  Defendant reported the findings to a technical advisory committee consisting of the USFWS, Western EcoSystems Technology, Inc., and Wyoming Game and Fish.  Between August 2009 and the date of these pleadings, the carcasses of 23 golden eagles, along with 242 additional non-eagle migratory bird carcasses (including raptors, larks, sparrows, and others, as described in the Information), were found at the GRH project.  The eagle carcasses were sent to the USFWS National Forensics Laboratory in Ashland, Oregon, for forensic necropsy.  Of those which were fresh enough and complete enough to analyze, more than a dozen were determined to have been killed by blunt-force trauma consistent with turbine blade collision.

E.  Defendant responded to the avian mortalities at GRH by developing a BBCS for GRH, as recommended in the 2012 Land-Based Wind Energy Guidelines, that includes additional eagle nesting/use studies and mitigation measures aimed at reducing the collision risk to eagles, including observer-based turbine curtailment (shut down), and removal of carrion and prey habitat.  Defendant will apply for a Programmatic Eagle Take Permit for GRH, pursuant to the Migratory Bird Compliance Plan that is Attachment B hereto.

IV. **Defendant's Other Wyoming Wind Facilities**

A. In addition to the Seven Mile Hill and GRH facilities, Defendant owns and operates two other wind power facilities in Wyoming called "Dunlap" and "High Plains/McFadden Ridge."

B. The Dunlap facility is located in Carbon County, Wyoming. It consists of seventy-four (74) wind turbines having a capacity of 111.0 megawatts. Defendant commenced commercial operations at Dunlap in October 2010. Consistent with its state siting permit, Defendant conducted three years of post-construction monitoring and reporting at Dunlap in a manner similar to the monitoring and reporting described above. The company reported finding five dead golden eagles and one dead bald eagle at Dunlap (including one eagle carcass discovered prior to commercial operation), along with 83 other non-eagle migratory birds, between April 2010 and the date of these pleadings. It shared these monitoring results with the USFWS. Defendant developed a draft BBCS for this facility, as recommended in the 2012 Land-Based Wind Energy Guidelines, and will apply for a Programmatic Eagle Take Permit for Dunlap, pursuant to the Migratory Bird Compliance Plan that is Attachment B hereto.

C. High Plains/McFadden Ridge is located in Carbon and Albany Counties, Wyoming. It consists of eighty-five (85) wind turbines having a capacity of 127.5 megawatts. Defendant commenced commercial operations at High Plains/McFadden Ridge in September 2009. Pursuant to its state siting permit, Defendant conducted three years of post-construction monitoring and reporting at High Plains/McFadden Ridge in a manner similar to the monitoring and reporting described above. The company reported finding four dead golden eagles and two dead bald eagles, along with 84 other non-eagle

migratory birds, at the facility between October 2009 and the date of these pleadings.  It shared these monitoring results with the USFWS.  Defendant developed and implemented a BBCS for this facility, as recommended in the 2012 Land-Based Wind Energy Guidelines, and will apply for a Programmatic Eagle Take Permit for High Plains/McFadden Ridge, pursuant to the Migratory Bird Compliance Plan that is Attachment B hereto.

## V.  Conclusion

A.  The parties agree that the evidence described herein indicates that Defendant's unpermitted takings of eagles and other migratory birds at its Seven Mile Hill and GRH wind facilities were in violation of the MBTA and arguably could be charged under the Eagle Act.  However, the Department has exercised its discretion to enter into this plea agreement and charge Defendant with two misdemeanor violations of the MBTA due to Defendant's development of BBCSs for the four Wyoming wind facilities referenced in the Migratory Bird Compliance Plan, the company's cooperation during the investigation of this case, the company's willingness to acknowledge the facts contained herein and enter into the Plea Agreement, the company's voluntary and timely reporting of unpermitted avian takes, and the company's significant efforts to minimize and mitigate for past and future takes of eagles and other migratory birds at its wind power facilities in Wyoming.  But for such cooperation, the government would seek additional charges, substantially greater fine amounts, and additional sanctions.

B.  The Department and the USFWS believe, based on interactions with Defendant's counsel and management in the past eighteen months, and the facts discussed herein,

that Defendant has taken measures to protect migratory birds and safeguard public wildlife resources in the operation of its wind projects in Wyoming.

**ATTACHMENT B**

**MIGRATORY BIRD COMPLIANCE PLAN ("MBCP")**

**INTRODUCTION**

1. This MBCP is an element of the Plea Agreement in this case and has been developed by the defendant, PacifiCorp, an Oregon Corporation ("PacifiCorp"), the United States Department of Justice ("Department") and the U.S. Fish and Wildlife Service ("USFWS"). PacifiCorp, the Department and the USFWS are individually referred to in this MBCP as a "Party" and collectively as the "Parties." The purpose of this MBCP is to provide a collaborative framework for PacifiCorp's implementation of measures that will ensure compliance with the requirements of the Migratory Bird Treaty Act ("MBTA") and the Bald and Golden Eagle Act ("BGEPA") during the term of the MBCP.

2. The Department is aware that during the past twenty-four (24) months, PacifiCorp has been voluntarily implementing many of the measures described herein to avoid and minimize the unpermitted take of eagles and other migratory birds at its Seven Mile Hill ("SMH"), Glenrock/Rolling Hills ("GRH"), Dunlap and High Plains/McFadden Ridge ("HP/MR") wind sites in Wyoming (individually a "Wind Site" and collectively the "Wind Sites").

3. Avoidance, minimization and mitigation strategies aimed at protecting avian wildlife at commercial wind projects have been developed by the USFWS and industry at the national and regional level in documents including the 2003 Service Interim Guidance on Avoiding and Minimizing Wildlife Impacts from Wind Turbines, the 2009 Eagle Rule published by the USFWS on September 11, 2009, under BGEPA ("Eagle Rule"), the 2012 Land-Based Wind Energy Guidelines ("2012 LBWEG"), and the 2013 Eagle Conservation Plan Guidance Module 1 – Land-Based Wind Energy Version 2 ("2013 ECPG") and the 2013 USFWS Region 6 Recommendations for Avoidance and Minimization of Impacts to Golden Eagles at Wind Energy Facilities and Guidance on Outlines and Components of Eagle Conservation Plans ("ECPs") and Bird and Bat Conservation Strategies. These documents contemplate compliance measures for commercial wind facilities that are in the development stage as well as projects, like the Wind Sites in this case, which became operational prior to development of some of the relevant guidance.  The enforceability and effect of these documents, as well as any other relevant guidance, policy, regulations or recommendations developed by USFWS during the term of the MBCP, are neither diminished nor enhanced by their reference herein.

4. As described in the 2013 ECPG, Advanced Conservation Practices ("ACPs") are scientifically-supportable measures approved by the USFWS that represent the best available techniques to reduce eagle disturbance and ongoing mortalities to a level where remaining take is unavoidable (50 CFR 22.3). Because the best information currently available indicates there are no conservation measures that have been scientifically shown to reduce eagle disturbance and blade-strike mortality at wind projects, the USFWS has not currently approved any ACPs for wind energy projects. All ACPs are currently considered by the USFWS to be "experimental."

5. As described in the 2012 LBWEG, the USFWS has recommended that developers prepare written records of their actions to avoid, minimize and compensate for potential adverse impacts. In the past, the USFWS has referred to these as Avian and Bat Protection Plans (ABPP). However, ABPPs have more recently been used for transmission projects and less for other types of development. For this reason the USFWS has introduced a distinct concept for wind energy projects called Bird and Bat Conservation Strategies ("BBCS"). A developer may prepare a BBCS in stages, over time, as analysis and studies are undertaken for each tier of the 2012 LBWEG.  Each BBCS is unique for each wind energy project and subject to periodic amendment as knowledge about the project's impact on avian wildlife and the efficacy of minimization measures evolves over time.

6. Under the Eagle Rule, the USFWS can issue permits that authorize individual instances of take of bald and golden eagles when the take is associated with, but not the purpose of, an otherwise lawful activity, and cannot practicably be avoided. The regulations also authorize permits for "programmatic" take, which means that instances of "take" may not be isolated, but may recur. The programmatic take permits are the most germane permits for wind energy facilities. (2013 ECPG Exec. Summary, Chapter 4)

7. Where wind energy facilities cannot avoid taking eagles and eagle populations are not healthy enough to sustain additional mortality, Eagle Take Permit ("ETP") applicants must reduce the unavoidable mortality to a no net-loss standard for the duration of the permitted activity. No net-loss means that these actions either reduce another ongoing form of mortality to a level equal to or greater than the unavoidable mortality, or lead to an increase in carrying capacity that allows the eagle population to grow by an equal or greater amount. Actions to reduce eagle mortality or increase carrying capacity to this no net-loss standard are known as "compensatory mitigation" in the 2013 ECPG. Examples of compensatory mitigation activities might include retrofitting power lines to reduce eagle electrocutions, removing road-killed animals along roads where vehicles hit and kill scavenging eagles, or increasing prey availability. (2013 ECPG, Exec. Summary, Chapter 8)

2

**IMPLEMENTATION**

1. The Parties agree that the foundation of effectively minimizing take of eagles and other migratory birds at an operating wind project is scientifically-based avian use studies and fatality monitoring, along with data concerning historical take of eagles and other birds at the projects, which provide the data needed to understand the nature of the risk posed to avian wildlife by turbines and other infrastructure at the project, and to inform decisions about which experimental ACPs are most likely to minimize take.

2. **Bird and Bat Conservation Strategies:**
   a. PacifiCorp has exercised prudence by voluntarily developing and implementing a draft BBCS for each Wind Site.
      i. On a schedule to be determined by the Parties within six months of sentencing, PacifiCorp shall revise the draft BBCS for each Wind Site in consultation with the USFWS Region 6 Migratory Bird Management Office and the USFWS Ecological Services Wyoming Field Office.

3. **Mortality Monitoring/Reporting/Disposition, Nest Monitoring**
   a. PacifiCorp has conducted pre- and post-construction avian use studies and mortality monitoring at the Wind Sites.
      i. On a schedule to be determined by the Parties within four months of sentencing, PacifiCorp shall voluntarily provide data requested by the USFWS collected in avian use studies, coordinate with the USFWS regarding additional studies necessary to increase knowledge regarding use and occupation of the Wind Sites by eagles and, to the extent agreed upon by the Parties, other migratory birds.
      ii. On a schedule to be determined by the Parties within six months of sentencing, PacifiCorp shall provide to the USFWS the protocols currently in use, and all data collected in the mortality monitoring studies conducted at the Wind Sites.  Within three months after transmittal of the protocols, the Parties will collaborate and agree on any changes to current monitoring protocols necessary to ensure that scientifically-based protocols are being employed that provide reliable data regarding impacts of the Wind Sites on eagles and other migratory birds.
      iii. PacifiCorp will conduct nest searches within six months of sentencing using the protocol contained in Attachment 1, subsection A.6 .  Within six months from the date of sentencing, the Parties will meet and determine whether changes to the nest search protocol are necessary to improve its

3

effectiveness.  Any changes to the nest search protocol contained in Attachment 1 shall require the written agreement of the Parties.

iv.  Within four months of sentencing, PacifiCorp will apply for, and submit applications for renewal of as necessary, a Special Use – Utility (SPUT) Permit, pursuant to 50 CFR 21.27.

4.  **Experimental Advanced Conservation Practices, Best Management Practices:**

a.  PacifiCorp has voluntarily implemented several experimental ACPs at one or more of its Wind Sites; including experimental turbine curtailment, carrion removal, prey habitat reduction, and testing of an avian detection and deterrent system.

i.  Within six months of sentencing, PacifiCorp will propose a date to meet with the USFWS Region 6 Migratory Bird Management Office and the USFWS Ecological Services Wyoming Field Office to discuss the progress of the experimental ACPs discussed herein and agree on any changes thereto.

ii.  Sound and Light Deterrent Testing:

1.  PacifiCorp will complete an ongoing evaluation of the effectiveness of an audible sound and visual light deterrent at the GRH Wind Site.

2.  PacifiCorp will provide a report of the deterrent testing to the USFWS within 12 months of sentencing.

3.  If the deterrent test extends beyond 12 months from the date of sentencing, PacifiCorp shall provide a final report to the USFWS following completion of the test.

iii.  Informed Curtailment.

1.  Within one month of sentencing, PacifiCorp shall implement the Initial Informed Curtailment Protocol set forth in Attachment 2.

2.  The Parties agree that if information and experience with informed curtailment performed at the GRH Wind Site and the SMH Wind Site during 2012, 2013 and 2014 identifies cost-effective alternative methods to reduce the risk of eagle interaction with wind turbines that the Parties agree are equally or more effective than Informed Curtailment, PacifiCorp shall not be prevented from implementing such alternative method fully or partially in lieu of Informed Curtailment. Examples of such alternative methods include, but are not limited to, adjusting wind turbine operation parameters by making changes to the supervisory control and data acquisition ("SCADA") system; curtailment of one or more  high-risk turbines during high-risk hours and/or months; or other experimental ACPs.

4

   3.  The Parties agree that lost generation revenue resulting from Informed Curtailment shall not be included in the cost cap established in Section 6; provided, however, the Parties shall not be prevented from taking lost generation revenue into consideration when considering alternate methods contemplated in the subsection immediately above.

   iv.  Carrion Removal.  PacifiCorp will timely remove carrion from each Wind Site subject to applicable state and local laws and taking into consideration safety-related issues (e.g., snow, lightning) and contactor availability. In the case of livestock, PacifiCorp will timely coordinate with the owner to allow the owner to either remove the carrion timely or give permission to PacifiCorp to remove the carrion.

   v.  Roadway Carrion. Contingent on any applicable permits or any entity with authority regarding roadway carrion not imposing burdensome or added cost requirements, PacifiCorp shall timely have removed any large ungulate incidentally reported to PacifiCorp that is located on a Wyoming state highway and within one mile of a Wind Site boundary.

   vi.  Guyed towers. PacifiCorp will remove or replace guyed meteorological towers at a Wind Site if the guying is demonstrated to cause eagle injury or mortality. If replacement is chosen, PacifiCorp will replace the meteorological tower with an un-guyed tower.

5. **Programmatic Take Permits**

   a.  In anticipation of applying for programmatic ETPs for each Wind Site, PacifiCorp has begun drafting ECPs informed by the 2013 ECPG and has submitted a draft GRH ECP and a draft SMH ECP to the USFWS. The Parties understand that the process of completing an application for a programmatic ETP will be lengthy, given the novel nature of the permitting regime, potential future amendments of the Eagle Rule, and the heavy workload of USFWS personnel who are dealing with many other companies and projects.

   i.  On a schedule to be determined by the Parties within nine months of sentencing, PacifiCorp and the USFWS Region 6 Migratory Bird Management Office shall develop a mutually agreed schedule for PacifiCorp to submit or re-submit an ECP for each Wind Site; and for the time period in which the Region 6 Migratory Bird Management Office will provide initial reply comments and reply comments associated with a resubmitted ECP or ECP revisions.

6. **Cost of MBCP Implementation**
   a. PacifiCorp shall not be required to spend more than $600,000 per calendar year, in total for the Wind Sites (the "Annual Cost Cap"), developing and implementing items in this MBCP, as described herein, provided, *however*, the Parties agree that neither the cost of compensatory mitigation (defined below in paragraph 7) nor the cost of lost generation resulting from Informed Curtailment shall be included in tracking costs subject to the Annual Cost Cap.
   b. If the initiation or termination of the MBCP results in a partial calendar year, the Annual Cost Cap shall be pro-rated by the number of days the MBCP is in effect during such calendar year.
   c. The Annual Cost Cap applies to the following activities:
      i. Additional 2012 LBWEG tier 2, 3, 4 or 5 USFWS requested data or studies;
      ii. Other data the USFWS requests;
      iii. mortality monitoring (avian or bat) and associated reporting;
      iv. nest searches and associated reporting;
      v. implementing and reporting Informed Curtailment;
      vi. carrion removal, disposal, and reporting;
      vii. future unspecified activities, adaptive management and/or experimental ACPs; and
      viii. enabling/disabling changes to the SCADA, or other control-oriented costs, associated with a Wind Site.
   d. On or before March 15 of each year that this MBCP is in effect for any Wind Site, PacifiCorp will provide the USFWS and Department a written accounting of monies spent during the previous calendar year to implement the MBCP, broken down by Wind Site and category of action(s) implemented.

7. **Compensatory Mitigation**
   a. The Parties acknowledge that additional migratory birds, including eagles, are likely to be taken at PacifiCorp's Wyoming Wind Sites during the term of this MBCP, despite the implementation of experimental ACPs.
   b. Unless other compensatory mitigation measures are agreed to by the Parties, PacifiCorp will conduct compensatory mitigation for each eagle killed at a Wind Site between the date of sentencing and the termination of this MBCP by retrofitting 9.26 power poles operated by PacifiCorp, in the Bird Conservation Region ("BCR") encompassing the Wind Site where the taking occurs ("Compensatory Mitigation"). Compensatory Mitigation will be performed by retrofitting power poles which have been identified as posing a high electrocution risk to eagles, and which are not the subject of a pre-existing retrofitting plan based on any other criminal or civil agreement between PacifiCorp or any of its

6

affiliates and a government entity.  If there are insufficient high-risk power poles within the affected BCR to accomplish Compensatory Mitigation as contemplated herein, the Parties will meet and agree on alternative methods of compensatory mitigation which shall cost approximately the same as PacifiCorp's average cost to retrofit power-poles.

c. On a schedule to be determined within six months of sentencing, PacifiCorp and the USFWS will collaborate to jointly develop a plan for such retrofitting that includes scheduling, pole identification, prioritization of both pole types and geographic areas for Compensatory Mitigation within the appropriate BCR, and cost/completion reporting.

d. The Parties agree that nothing in this MBCP requires PacifiCorp to perform pole retrofits, associated with PacifiCorp-owned poles or otherwise, for third parties (i.e., pole retrofits associated with third party owned or operated wind projects).

e. As noted above, the cost of Compensatory Mitigation shall not be counted against the Annual Cost Cap.

8. **MBCP Term, Applicability and Termination**

a. The term of the MBCP shall begin on the date the Plea Agreement, Statement of Facts, and the MBCP are accepted by the Court. The MBCP shall terminate for a given Wind Site upon the earlier of: (1) the issuance of a Programmatic ETP for that Wind Site, whereupon the terms of such ETP shall supersede all terms of this MBCP, or (2) the termination of the non-prosecution period set forth in the Plea Agreement.

**Attachment 1 – Initial Mortality Monitoring/Eagle Nest Search Protocols**

PacifiCorp shall perform mortality monitoring at each Wind Site as described below in subsections A.1, A.2, A.3, A.4 and A5.

**A.1 GRH Wind Site.** PacifiCorp will utilize qualified individuals to perform carcass searches at selected turbines two times a month (approximately every two weeks). To ensure comparability to the three years of standardized monitoring (previously conducted from May 2009 through May 2012), PacifiCorp will monitor the 54 turbines originally selected for standardized monitoring.

**A.2 SMH Wind Site.** PacifiCorp will utilize qualified individuals to perform carcass searches at selected turbines two times a month (approximately every two weeks). To ensure comparability to the three years of standardized monitoring (previously conducted from May 2009 through May 2012), PacifiCorp will monitor the 27 turbines originally selected for standardized monitoring.

**A.3 Dunlap Wind Site.** PacifiCorp will utilize qualified individuals to perform carcass searches at selected turbines two times a month (approximately every two weeks). To ensure comparability to the three years of standardized monitoring (previously conducted from March 2011 through February 2014), PacifiCorp will monitor the 26 turbines originally selected for standardized monitoring.

**A.4 HP/MR Wind Site.** PacifiCorp will utilize qualified individuals to perform carcass searches at selected turbines two times a month (approximately every two weeks). To ensure comparability to the three years of standardized monitoring (previously conducted from October 2009 through October 2012), PacifiCorp will monitor the 29 turbines originally selected for standardized monitoring.

**A5. All Wind Sites.** At each Wind Site, square plots (160 m [525 ft] on a side) will be searched at each of the selected turbines. Since emphasis will be placed on detecting large bird carcasses (i.e. eagles), transects will be spaced approximately 20 m (33 ft to 50 ft) apart. In addition, since the possibility exists for eagle carcasses to occur in all areas of the project, surveyors will also inspect all other turbines in the project consistent with the schedule in A.1 through A.4 above, this inspection will include conducting a visual inspection from the turbine pad as well as examination on foot of any areas hidden from view of the turbine pad. Searches will not be performed when weather conditions make turbines inaccessible or unsafe to access in a standard road vehicle.

Modifications to this protocol may be warranted over time as new information becomes available.

PacifiCorp shall perform nest searches at each Wind Site as described below in subsection A.6.

**A.6 Wind Site Nest Site Searches.** PacifiCorp will conduct annual eagle nest surveys and will monitor known active eagle nests within 2.5 miles of the Wind Site (subject to weather conditions, safety, and landowner access to nests) to determine if local breeding pairs have been impacted by any identified eagle mortalities. These additional nest monitoring efforts will be conducted within five business days (subject to contractor availability) of the discovery of an eagle carcass at a Wind Site. In addition, to avoid, minimize or mitigate impacts to abandoned eggs or nest young, PacifiCorp will notify USFWS if local nesting impacts are documented.

Modifications to this protocol may be warranted over time as new information becomes available.

**Attachment 2**

**Initial Informed Curtailment Protocol**

**Glenrock/Rolling Hills/Glenrock III (GRH) Wind Site**

**and**

**Seven Mile Hill/Seven Mile Hill II (SMH) Wind Site**

This Informed Curtailment protocol applies to PacifiCorp's Glenrock/Rolling Hills/Glenrock III (GRH) Wind Site and Seven Mile Hill/Seven Mile Hill II (SMH) Wind Site during established time periods and conditions. "Informed Curtailment" means the use of biological monitors stationed at a Wind Site, when safe to do so, that have the capability to call for curtailment of one or more turbines based on the protocol set forth in Attachment 2.

The informed curtailment of wind turbine generators due to eagle proximity is an experimental ACP method intended to help reduce potential turbine collisions with eagles. The goal of informed curtailment is to identify risky eagle flight behavior/pathways and notify site personnel prior to potential turbine interaction. Curtailment of turbines will be based on knowledge of eagle activity and observed behaviors for the GRH Wind Site and the SMH Wind Site. An observer will notify site personnel whenever eagle flights are observed near/toward individual turbines or a grouping of turbines. An observer will also notify site personnel when risk is reduced to an acceptable level to release the turbine or grouping of turbines from curtailment.

Due to the geographic extent of the GRH Wind Site and the SMH Wind Site, an observer may not be able to visually identify every eagle in the vicinity of turbines. Positioning of an observer will be as appropriate to maximize eagle detection in known eagle high use areas. An observer will be mobile, as necessary, to best detect potential risky flights by eagles. The location of an observer may also be altered over time as eagle activity changes at the GRH Wind Site or the SMH Wind Site.

An observer will notify site personnel of a recommendation to implement turbine curtailment if:

- Eagle(s) are observed within 800 meters of a turbine or grouping of turbines;
- Eagle(s) flight paths are reasonably likely to cross through or near turbine(s) based on observed heading or assumed trajectory;
- Eagle(s) are observed actively foraging within or near turbines or a group of turbines; or
- Any other behavior is observed in which an observer believes it is reasonably likely that an eagle(s) is moving toward a potential collision with a turbine.

An observer will use their professional judgment based on knowledge of the GRH Wind Site or the SMH Wind Site and eagle behavior; *however*, it is understood that eagle activity and other environmental variables (e.g., wind conditions) are unpredictable.

An observer will monitor eagle activity while within sight, or until a higher priority risk is observed (e.g., eagle approaching turbines). An observer will notify site personnel with an "all clear" once eagle risk is reduced to an acceptable level as determined by the observer. Site personnel will notify the observer when turbine curtailment has ended. The following is a list of factors that an observer will consider when deciding when to notify facility personnel to resume turbine activity:

- No eagle activity has been observed for 10 consecutive minutes in a turbine group;
- Eagle is perched beyond 800 meters from closest  turbine or turbine group;
- Eagle flight direction observed away from turbines or turbine group and eagle is beyond a 1,600 meter buffer;
- Eagle is observed increasing elevation above turbines or turbine group in patterned behavior at least 400 meters above ground level; or
- Time of day, visibility, or other factors.

Informed Curtailment will not occur if weather conditions create potentially unsafe conditions for an observer, or if observer visibility is heavily impaired.

Under this Protocol, PacifiCorp will employ biological monitors for the purpose of Informed Curtailment according to the following schedule:

GRH Site – Two biological monitors seven days per week, seven hours per day (0900 hours to 1600 hours, Mountain time), during the months of October, November, December, January, February and March.

SMH Site – One biological monitor seven days per week, five hours per day (0900 hours to 1400 hours, Mountain time), during the months of January, February, and March.

Modifications to this protocol may be warranted over time as new information becomes available.